## Shields v. Neal.

(Decided May 5, 1914.)

### Appeal from Nelson Circuit Court.

Death—Action for Causing Death—Trial—Judgment—Review—Instructions.—In an action to recover damages for the killing of plaintift's husband, defendant defended upon the ground of self-defense. The court instructed the jury to find for defendant if he at the time of the killing believed and had reasonable grounds to believe that his life was then in danger or that his person was then in danger of violence at the hands of the deceased. Held, that this instruction was not prejudicial, although the phrase, "death or great bodily harm," is to be preferred, it having become thoroughly imbedded in the law of self-defense and because it so well expresses the measure of danger necessary to justify the exercise of the right in question.

O'DOHERTY & YONTS for appellants.

JOHN A. FULTON, NAT. W. HALSTEAD for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

On September 29, 1911, Preston Neal shot and killed Dr. A. M. Shields in Chaplin, Nelson County. His widow thereupon instituted this action in the Nelson Circuit Court to recover damages from Neal for said killing, under section 6, Kentucky Statutes.

Upon a trial of the action, a jury returned a verdict in favor of the defendant; and from the judgment thereon entered this appeal is prosecuted, the only ground

presented by the record for a reversal of the said judgment being error of the court in instructing the jury.

The instruction complained of is as follows:

"No. 2. The court instructs the jury that if they believe from the evidence that at the time the defendant shot and killed A. M. Shields, he then in good faith believed, and had reasonable grounds to believe that his life was then in danger, or that his person was then in danger from violence at the hands of said Shields, and that defendant had no apparent and safe means of protecting his own life and person but by shooting said Shields, then the law is for the defendant, and the jury should so find."

Appellant insists that this instruction is not authorized by the evidence, and that it is not in proper form.

It appears from the evidence that appellee, Neal, and Rev. P. C. Eversole were trustees of the estate of Elliott Houtchens, which estate consisted of real and personal property, and was a large one. Previous to the killing, Eversole and Neal, under an order of court, sold one farm and some personal property thereon, at public auction on November 15, 1910, at which sale Dr. Shields became the purchaser of said farm for the sum of $17,995.00. Appellee, Neal, either for the protection of the estate, or as a bona fide bidder, under an arrangement with the auctioneer, made secret bids at this sale of the farm. Shields afterwards discovered this, and claimed that by such action of Neal's he was forced to pay for the farm much more than he would otherwise have been compelled to pay therefor; and he seems to have become incensed at Neal, and made disparaging remarks about him in regard to it.

At said sale, Shields also became the purchaser of some corn, which had not then been gathered, but which was to be afterwards gathered and delivered. The price was fixed, but no settlement could be then made as the quantity was not then known.

There was on the farm a large iron kettle, on a platform near the cistern, which had been used for watering stock, though it was not a fixture thereon. This kettle was not sold or offered for sale separately, and after the sale, Shields claimed that on account of the use which had theretofore been made of it, it was included in his purchase and went with the farm. Eversole had this kettle removed from the farm; and Shields spoke to Neal about it, claiming it should be returned,

or that he should have a credit in the sum of five dollars for it upon the amount he owed the estate. Neal would neither agree at the time to return the kettle, nor to allow the credit of five dollars, but told Shields he would see Eversole, and they would arrange to settle the matter in some way.

Eversole lived at Richmond; Neal lived at Shakertown, in Mercer county; and Dr. Shields lived in Chaplin, in Nelson County. On the morning of the killing, Neal and Eversole went to the home of Dr. Shields, for the purpose of making a settlement concerning the corn, which had theretofore been delivered. They drove to Chaplin in Neal's buggy, hitching same at a telephone pole near where the killing was later done. After some preliminary talk at Shields' house, the three started for the bank, which was a short distance around the corner from Shields' residence. On the way to the bank, in passing Neal's buggy, Neal stopped to arrange the storm apron, Shields and Eversole proceeding on to the bank. On arriving at the bank, Eversole requested the cashier to give him a note which he had previously requested the cashier to make out, saying in the presence of Shields that Shields was going to sign the note, and that when John Shields or John Cheatham, either one, signed it, it would be considered an accepted note, to be held there until he, Eversole, called for it.

Shields then said that he should not be required to pay any interest, and that he ought to have credit for the kettle. Eversole replied that he was in a hurry, having an engagement to meet a man at Mrs. Houtchens', and did not have time to discuss the matter, but said that if it should develop in the future that Shields was entitled to the credit of five dollars for the kettle, he would endorse such credit upon the note. Shields said, "No, I want it settled now," and went to the door and called Neal.

When Neal arrived, Eversole informed him of the conversation just had between him and Shields concerning the kettle, but seems to have misunderstood the proposition made by Shields concerning the kettle; and when Neal said, "Well, let him have it," Shields said, "No, I will give one dollar or take five dollars," and again said he ought not to have to pay interest and that he had tried to get a settlement and could not get it. Neal replied that he and Eversole had wanted a settlement and could not get it. Shields insisted on

being relieved from the payment of interest; and Neal then said, "Well, Doctor, let's drop this matter; there is no use saying anything more about it." Shields again repeated that he should not be required to pay interest, and then Shields and Neal got into a warm dispute; and Eversole went out in front of the bank to call for help to quell the disturbance.

One witness, a clerk in the bank, says that Shields commenced cursing and said Neal was trying to rob him, and that Neal had torn up the farm-house in different places; and that Shields threw up his cane and told Neal he would knock hell out of him. Just then, the president of the bank stepped in, and he told Shields to go on out. Shields said to him, "I guess you are taking sides in this," to which the president of the bank replied that the bank was a place of business, and that he had a right to protect it, and he told Neal to go on into the rear room, and told Shields to go on out. Shields went out, and as he did so, he told Neal to come out there and he would shoot it out with him or fight it out with him any way he wanted to. Neal told Shields he was unarmed, and obeying the request of the bank president went into the rear room of the bank. In this room was kept a revolver, and it was this revolver with which Neal shot Shields. As Shields passed out of the bank, Everesole who had preceded him, took Shields by the arm and walked with him across and down the street. Shields, as they walked along, was talking loudly and calling Neal vile names. Eversole requested him to go on home, saying that they could not settle then, but could settle some other time. They walked on down to the telephone pole near where Neal's horse was hitched, where Shields stopped, Eversole still urging him to go on home, again saying that he had an engagement and would be unable to remain in Chaplin any longer.

While the two were standing there, and some fifteen or twenty minutes after Shields left the bank, Neal came out of the bank walking in the direction of where Eversole and Shields were standing and of where his horse was hitched; and Eversole says that as Neal approached them, Shields slipped his hand down about a fourth of the way on his cane and started in the direction of Neal. Eversole then turned away and seems unable to clearly narrate what immediately followed.

One witness states that Shields and Eversole stopped close to Neal's horse, and Shields was abusing some one

and calling some one all kinds of vile names. Witness listened to find out who it was that Shields was abusing. He did not see Neal at that time. He heard Shields say that "he is" or "you are a lying son of a b———;" and then heard Neal say, "Don't call me a lying son of a b———." Then Shields started in the direction of Neal with his cane grasped in both hands in striking position. This witness then testified as follows. "Q. How far did he go towards Neal? A. He was down somewhere about the telephone pole, something like twenty or twenty-five feet, maybe twenty-two feet; he was down there, and he advanced to the corner of the store when he was shot. Q. Did he still have the cane uplifted at the time he was shot? A. Yes, sir; still held the cane in that position. Q. Just tell the jury, when the shot was fired, if Dr. Shields stopped, come on any further, or just what he did. A. He might have come a step after he was shot, for he was going pretty rapid. I think he threw his hand up against the corner of the store and that stopped him, left hand, and he turned and went back. The cane which Shields had on the occasion was offered in evidence by the defendant and admitted, and we presume that because it was before the jury there is no evidence describing it.

All the witnesses on both sides, except appellant herself and a physician of whom the inquiry was not made, say that Shields bore the reputation of being a violent and dangerous man.

The evidence directly connected with the shooting is somewhat contradictory, and we will not attempt to reconcile or weigh it, or to say whether appellee was justified in the killing, as this question is not before us. We are merely stating the evidence upon which the court based the instruction on self-defense. It seems clear to us that such an instruction was not only justified by the evidence; but that it would have been a reversible error to have refused it.

2. Objection is also made to the form of the instruction, appellant claiming that under it the jury were authorized to find for the defendant if they believed from the evidence that at the time the defendant killed Shields, he, the defendant, had reasonable grounds to apprehend any violence to his person, however slight, at the hands of said Shields. Appellant contends that the use of the words, "That his life was then in danger, or that his person was then in danger from violence at the

hands of said Shields," was error. It is suggested by appellee that the words complained of were used by the trial court upon the authority of McClurg v. Igleheart, 17 R., 913, 33 S. W., 80, in which case this court indicated that an instruction using the language in question; would be proper.

Appellant contends, and in that contention this court concurs, that a reasonable apprehension of death or great bodily harm is the true and proper standard for the guidance of the jury in cases involving the right of self-defense. The phrase, "death or great bodily harm" has become so thoroughly imbedded in the law of self-defense and so well expresses the measure of danger necessary to justify the exercise of the right in question that in criminal cases its use is required, and while we think it the safer phrase to use in civil actions also, the court is unwilling to hold that the failure to use it in this case was prejudicial. We do not believe that the jury was misled or that they could have received the impression from the instructions as given, that they should find for the defendant if they believed from the evidence that at the time defendant killed Shields, he, the defendant, believed or had reasonable grounds to believe that Shields was merely going to inflict upon him some slight or inconsequential injury.

An instruction on self-defense was justified by the evidence; and under the evidence, the one given was not prejudicial to appellant.

The judgment, therefore, is affirmed.